**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **WILLIAM EPPERSON, and** | : | |
| **NATALYA EPPERSON** | : | |
| | : | **CIVIL ACTION** |
| *Plaintiffs*, | : | |
| | : | |
| **V.** | : | **NO:** |
| | : | |
| | : | |
| **DELTA AIRLINES, INC.** | : | |
| | : | |
| *Defendant.* | | |

## NOTICE OF REMOVAL OF DEFENDANT, DELTA AIR LINES, INC.

Defendant, Delta Air Lines, Inc. i/s/h/a "Delta Airlines, Inc." (hereinafter "Removing Defendant"), by and through its attorneys, Morgan & Akins, PLLC, via this Notice of Removal (hereinafter "Notice") hereby removes the instant action from the Circuit Court for Bradley County, Tennessee, Docket No. V-24-732, to the United States District Court for the Eastern District of Tennessee, pursuant to 28 U.S.C. §§ 1331 and 1446, and in support thereof states as follows:

1.     Plaintiffs, William Epperson and Natalya Epperson (hereinafter "Plaintiffs") commenced the above-referenced action by the filing of a Complaint (hereinafter "Complaint") on or about December 30, 2024. (A true and correct copy Plaintiffs' Complaint is attached hereto as **Exhibit "A."**)

2.     In the Complaint, Plaintiffs allege that, "[o]n about June 27, 2024, Plaintiffs were travelling from Chattanooga, Tennessee (CHA) to Milan-Malpensa, Italy (MXP), through Atlanta, Georgia (ATL) and Queens, New York (JFK), on Delta flights DL5268, DL2398, and DL0184

1

from JFK to MXP." Plaintiffs allege that the subject incident giving rise to the instant matter occurred on flight "DL0184 from JFK to MXP." *See* ¶ 5 of **Ex. "A."**

3.      Plaintiffs allege that Removing Defendant caused delay in delivery of their four (4) bags of luggage and was responsible for stolen items from their luggage while it was within their possession. *See* ¶¶ 12, 13 and 18 of **Ex. "A."**

4.      Plaintiffs further claim that they were never reimbursed with reasonable expenses by Removing Defendant due to the alleged aforementioned incident. *See* ¶18 of **Ex. "A."**

5.      As a result, Plaintiffs allege a first cause of action of "Delayed Baggage Under Montreal Convention." *See* ¶19 of **Ex. "A."** Plaintiffs allege that Removing Defendant is liable under Article 19 of the Montreal Convention "for damage occasioned by delay in the carriage by air of baggage." *Id*. at ¶20.

6.      Further, Plaintiffs allege that "[b]y retaining the baggage fee in such instances, Defendant has been unjustly enriched under. . .federal common law." *Id*. at ¶42. Then, Plaintiffs allege that "[i]n failing to refund the baggage fee to Plaintiffs. . .Defendant breached the covenant of good faith and fair dealing under. . .federal common law." *Id*. at ¶47. Again, Plaintiffs allege, that Defendant "blatantly violate[d] the. . .Federal Trade Practices Act." *Id*. at ¶81.

7.      Removing Defendant received Plaintiffs' Complaint on January 6, 2025, and while specifically not averring that proper service was effectuated nor waiving any right to challenge service, bases the removal deadline on this date.

### <u>NOTICE OF TIMELY FILED</u>

8.      This Notice is timely because it is filed within thirty (30) days of Removing Defendant's receipt of a "pleading, motion, order or other paper from which it may first be ascertained" that the action is removable. 28 U.S.C §1446(b).

2

9.    Furthermore, this Notice is timely because it is filed within one (1) year of the inception of the matter.  28 U.S.C §1446(c)(1).

10.    Pursuant to 28 U.S.C §1446(b), the parties' deadline for removal, based upon Removing Defendant's receipt of certified mailing date on January 6, 2025, is February 5, 2025, and this Notice is timely filed.

## FEDERAL QUESTION

### Plaintiffs Make Federal Claims on Face of Complaint

11.    Pursuant to 28 U.S.C. § 1331, the "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or *treaties of the United States*." (emphasis added)

12.    Pursuant to 28 U.S.C. § 1441(a), "any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

13.    The Convention for the Unification of Certain Rules for International Carriage by Air, also known as the Montreal Convention ("Convention"), "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward." *See* Art. 1(1) of the Convention.

14.    The Convention defines "international carriage" as

> any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transshipment, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party

*Id*. at Art. 1(2).

15.     The courts in the Sixth Circuit have upheld the exclusive remedy of the Convention for international travelers, stating: 'The Montreal Convention' applies to all international carriage of persons, baggage or cargo performed by aircraft for reward. Given the 'relatively little case law interpreting the Montreal Convention,' the Courts consider decisions involving comparable terms of the Warsaw Convention. *If applicable, the Montreal Convention 'provide[s] the exclusive basis for recovery'." Tata AIG Gen. Ins. Co., Ltd. v. British Airways PLC Corp.*, No. 3:12-cv-00067, 2013 U.S. Dist. LEXIS 89830, at *35 (M.D. Tenn. June 18, 2013) (citations omitted) (emphasis added).

16.     The Sixth Circuit Court of Appeals has recognized the preemption of the Convention, and its predecessor, the Warsaw Convention, in *Doe v. Etihad Airways, P.J.S.C.*: "Under the Supremacy Clause, treaties are 'the supreme Law of the Land.' U.S. Const. art. VI, cl. 2. …As with the Montreal Convention, the Warsaw Convention provided international air passengers' exclusive remedy for claims governed by that treaty." *Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 411-12 (6th Cir. 2017) (Citations omitted).

17.     In general, the Sixth Circuit Court of Appeals has recognized the innate Supremacy of a treaty:

> [t]he doctrine of preemption springs from the Supremacy Clause of the Constitution: 'the Constitution and the Laws of the United States which shall be made in Pursuance thereof . . .shall be the supreme Law of the Land.' As interpreted by Chief Justice Marshall, 'in every case, the act of Congress, or *the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it*.' Preemption is predicated on congressional intent. The will of Congress to monopolize an area of legislation may be expressed in the authorizing statute and in the regulations enacted pursuant to that statute.

*Gustafson v. City of Lake Angelus*, 76 F.3d 778, 782 (6th Cir. 1996) (citations omitted) (emphasis added).

4

18.     Where a treaty is so expansive as to control the entire field of law, the Sixth Circuit Court of Appeals has held the preemption to be implied stating, "[s]econd, absent express preemption, federal law may have an implied preemptive effect if Congress revealed this intent by 'occupying the field' of regulation." *Id*.

19.     Plaintiffs' trip from New York (JFK) to Italy (MXP) is international carriage under the plain meaning of the Convention's definition.

20.     The United States and Italy are each State Parties to the Convention, with each having ratified the Convention. *See* **Exhibit "B"**, list of signatories to, and ratifiers of, Convention for the Unification of Certain Rules for International Carriage by Air Done at Montreal on May 28, 1999.

21.     Plaintiffs' baggage delays and/or lost/damaged items clearly are within the Convention's scope of liability.

22.     Specifically, Articles 17(2), 19, 22(1), (2) and 22(5) of the Convention exclusively govern claims for damages for lost baggage for all international flights subject to the Convention.

23.     These provisions of the Montreal Convention preempt all state law claims arising from the destruction, loss, damage, or delay of baggage resulting from carriage on international flights. *See* Art. 29 of the Montreal Convention ("In the carriage of passengers, baggage and cargo, any action for damages, *however founded*, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability are set out in this Convention. . .") (emphasis added); *see also Weiss v. El Al Israel Airlines*, 433 F. Supp. 2d. 361, 365 (S.D.N.Y. 2006) ("It is well settled that [Article 29] means that for all air transportation to which the Convention applies, if an action for damages, however founded, falls within one [of] the Convention's three damage provisions [including Article 19 claims for baggage delays], the

Convention provides the sole cause of action under which a claimant may seek redress for his injuries."); *Mbaba v. Societe Air France*, 457 F. 3d 496, 500 (5th Cir. 2006) (the Montreal Convention "preempts claims resulting from the carriage of baggage 'however founded'.").

24. Because Plaintiffs' claims are completely preempted by the Convention, which provides Plaintiffs' excusive remedy, this Court therefore has federal question jurisdiction pursuant to 28 U.S.C. §1331. *See, e.g., Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) ("Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law."); *see also Garrisi v. Nw. Airlines*, No. 10-12298, 2010 WL 3702374, *5 (E.D. Mich. Sept. 16, 2010) ("The Court agrees with the analysis in In re Air Crash at Lexington, Ky. Aug. 27, 2006), 501 F. Supp. 2d 902, 913 (E.D. Ky. 2007). As explained above, [the plaintiff's] negligence claim for personal injuries falls within the Montreal Convention. Thus, her [state law negligence] claim is completely preempted and federal question jurisdiction exists."); *Knowlton v. Am. Airlines*, No. RDB-06-854, 2007 WL 273794, *5 (D. Md. Jan. 31, 2007) (denying the plaintiff's motion to remand because the Montreal Convention completely preempted the state law claims, which gave rise to federal question jurisdiction).

25. Original federal question jurisdiction exists under 28 U.S.C. §1331, so removal of this action is proper under 28 U.S.C. §1441(a); *Garrisi v. Nw. Airlines*, 2010 WL 3702374, *5 (E.D. Mich. Sept. 16, 2010).

**Plaintiffs' State Law Claims Fail the *Grable* Doctrine**

26. Plaintiffs' Complaint likewise contains claims purporting to arise from state law, which are, in fact, federal law claims.

6

27.    While, from the preceding paragraphs, it is evident that Plaintiffs' state law claims are subsumed under the Montreal Convention, even under the *Grable* doctrine, Plaintiffs' claims may be considered arising under the Convention pursuant to 28 U.S.C. § 1331.

28.    State law claims "may be considered 'arising under the Constitution, laws, or treaties of the United States,' [pursuant to] 28 U.S.C. § 1331, where those claims 'implicate significant federal issues'." *Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

29.    Pursuant to the *Grable* doctrine, "federal question jurisdiction exists for state law claims in which a federal issue is '(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress'." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

30.    Furthermore, a state law claim "necessarily raises federal questions where the claim is affirmatively 'premised' on a violation of federal law." *Bolton v. Gallatin Ctr. For Rehab. & Healing, LLC*, 535 F. Supp. 3d 709, 714 (M.D. Tenn. 2021) (*quoting New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (6th Cir. 2016)).

31.    In their Complaint, Plaintiffs set forth injury and damages due to delay and/or damage to their baggage under the Convention. *See* Pages 5 – 6 of **Ex. "A."**

32.    Plaintiffs' allegations of delay and/or damage to their baggage form the basis of their subsequent eleven (11) counts of Breach of Contract; Refusal to Reimburse; Unjust Enrichment; Breach of Covenant of Good Faith and Fair Dealing; Failure to Exercise Reasonable Care; Negligence; Gross Negligence; Intentional Infliction of Emotional Distress; Negligence Infliction of Emotional Distress; Negligent/Intentional Misrepresentation; Conversion.

33. Plaintiffs also plead violation of the Federal Trade Practices Act under Count Eleven (11) – Negligent/Intentional Misrepresentation. *See* Page 12 of **Ex. "A."**

34. Removing Defendant submits that all of Plaintiffs' claims against Removing Defendant concern "federal issue[s]" which are "raised. . .disputed. . .substantial . . . [and] capable of resolution in federal court." *Gunn,* 568 U.S. at 258.

35. Plaintiffs' first (1) count is "raised" by means of inclusion of claims of failure to timely deliver their baggage and/or allegedly stealing items from their baggage, "disputed" insofar as Removing Defendant denies Plaintiffs' allegations, "substantial" since (as noted below) they form the basis of each and every one of Plaintiffs' claims, and certainly "capable of resolution" in this Honorable Court's hands, as the Court is intimately familiar with the Federal law issues at play.

36. Critically, each and every one of Plaintiffs' other claims - Breach of Contract (Second Count); Refusal to Reimburse (Third Count); Unjust Enrichment (Fourth Count); Breach of Covenant of Good Faith and Fair Dealing; Failure to Exercise Reasonable Care (Fifth Count); Negligence (Sixth Count); Gross Negligence (Seventh Count); Intentional Infliction of Emotional Distress (Eight Count); Negligence Infliction of Emotional Distress (Ninth Count); Negligent/Intentional Misrepresentation (Tenth Count); Conversion (Eleventh Count) – are borne out of allegations relating to the luggage issues set forth in Plaintiffs' First Count. *See* **Ex. "A,"** ¶¶ 25 – 86.

37. In Plaintiffs' Second Count, they plead that Removing Defendant "fail[ed] to check Plaintiffs' baggage for the flights on which they were traveling, and further breached the contracts by pilfering certain items from Plaintiffs' checked baggage while said baggage was in the sole custody of the Defendant." *Id*. at ¶ 29.

38.     In Plaintiffs' Third Count, they plead that Removing Defendant "failed and refused to reimburse Plaintiffs any amount for their out-of-pocket expenses during the delay of their baggage." *Id*. at ¶ 35. They further plead that they "have not been reimbursed for their stolen items or their out-of-pocket expenses incurred during the delay of their baggage." *Id*. at ¶ 37.

39.     In Plaintiffs' Fourth Count, they plead that Removing Defendant "retain[ed] the baggage fee in such instances, Defendant has been unjustly enriched under both state and federal common law." *Id*. at ¶ 42.

40.     In Plaintiffs' Fifth Count, they plead that Removing Defendant "fail[ed] to refund the baggage fee to Plaintiffs whose baggage it failed to check on their respective flight, Defendant breached the covenant of good faith and fair dealing under both state and federal common law." *Id*. at ¶ 47.

41.     In Plaintiffs' Sixth Count, they plead that Removing Defendant "fail[ed] to exercise reasonable care in the handling and transit of the Plaintiff's luggage." *Id*. at ¶ 50.

42.     In Plaintiffs' Seventh Count, they plead that Removing Defendant "failed to secure and protect Plaintiffs' luggage with reasonable care. Defendant failed to transport Plaintiffs' luggage from New York to Milan. . .As a result, Defendant lost, misdirected, and pilfered Plaintiffs' luggage." *Id*. at ¶ 54.

43.     In Plaintiffs' Eighth Count, they plead that Removing Defendant "[did] not properly screen and monitor its employees and other parties handling the luggage of passengers." *Id*. at ¶ 58.

44.     In Plaintiffs' Ninth Count, they plead that Removing Defendant's "course of conduct" is "outrageous due to special relationship between Plaintiffs' and [Removing Defendant] and its servants and agents as a common carrier." *Id*. at ¶ 62.

45.     In Plaintiffs' Tenth Count, they plead that Removing Defendant's "course of conduct" is "outrageous due to special relationship between Plaintiffs' and [Removing Defendant] and its servants and agents as a common carrier." *Id*. at ¶ 69.

46.     In Plaintiffs' Eleventh Count, they plead that Removing Defendant "misrepresented the character, benefit, and quality of its services to entice Plaintiffs into purchasing tickets from Defendant." *Id*. at ¶ 76. They further allege that "Plaintiffs sustained damages in that they had to replace the contents of their luggage that were stolen while in Defendant's sole care and custody." Id. at ¶ 78.

47.     In Plaintiffs' Twelfth Count, they plead that Removing Defendant "wrongly took Plaintiffs' property, without permission or authorization, for its own personal and wrongful use." *Id*. at ¶ 85.

48.     In short, *each and every one* of Plaintiff's purported state law causes of action, as set forth in the Complaint, concern Plaintiffs' allegations concerning injuries and damages due to delay of delivery and/or damage to their luggage, necessary implicate federal law, and which concern standards of federal aviation practice and safety. *See generally* Ex. "A."

49.     Stated differently, all of Plaintiffs' purported State law claims flow entirely from Plaintiffs' asserted claims related to their luggage, which, as stated above, necessarily require a "determination of federal law as an essential element" of their allegations. *Smith* 255 U.S. at 199-200.

50.     Pursuant to the *Grable* doctrine, each of Plaintiffs' state law claims, "implicate significant federal issues" and, ultimately, the four (4)-part *Grable* test unequivocally establishes that all of Plaintiffs' claims are based in federal law.

10

## CONCLUSION

51.     The "face" of Plaintiffs' Complaint specifically mentions a myriad of federal law bases for Plaintiffs' allegations, Plaintiffs' claims "arise under" federal law, and, even when alleged as state law counts, "implicate significant [F]ederal issues."

52.     The Convention provides the exclusive remedy for Plaintiffs to pursue their claim for damages as a result of the alleged subject incident. Montreal Convention, Article 17; *Doe v. Ethiad Airways, P.J.S.C.*, 870 F.3d at 411-12.

53.     Resultantly, this Honorable Court has original jurisdiction over the instant matter pursuant to 28 U.S.C. §1331.

54.     This action may be removed to this Court by the Removing Defendant pursuant to 28 U.S.C. §1441(a), in that this case was initially brought in a state court within the geographical area of the Eastern District of Tennessee.

55.     Removing Defendant has given written notice of the filing of this Notice pursuant to 28 U.S.C. §1446(d), by filing this Notice with the Circuit Court of Bradley County, Tennessee, and by giving written notice to counsel for Plaintiffs.

56.     All pleadings, process, orders and other filings in the State Court action are attached to this Notice as required by 28 U.S.C. §1441(a).

**WHEREFORE**, Defendant, Delta Air Lines, Inc. i/s/h/a "Delta Airlines, Inc.", by and through its attorneys, Morgan, Akins & Jackson, PLLC, via this Notice of Removal, hereby removes the above-captioned action, from the Circuit Court of Bradley County, Tennessee, to the United States District Court for the Eastern District of Tennessee, pursuant to 28 U.S.C. §§ 1331 and 1446.

11

Respectfully Submitted,

**MORGAN, AKINS & JACKSON, PLLC**


___*/s/ B. Duane Willis*_____
B. DUANE WILLIS, ESQUIRE
Tennessee BPR Number: 019657
10 Burton Hills Boulevard
Suite 210
Nashville, TN 37215
Phone: 612.829.5995
Facsimile: 615.829.5992
Email: dwillis@morganakins.com
*Counsel for Defendant, Delta Air Lines Inc. i/s/h/a*
*"Delta Airlines, Inc."*

Date:  <u>February 3, 2025</u>

12

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| WILLIAM EPPERSON, and | : | |
| NATALYA EPPERSON | : | |
| | : | CIVIL ACTION |
| *Plaintiffs*, | : | |
| | : | |
| V. | : | NO: |
| | : | |
| | : | |
| DELTA AIRLINES, INC. | : | |
| | : | |
| *Defendant.* | | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2025, a copy of the foregoing Notice of Removal and all accompanying papers were filed with the Court via the CM/ECF system. I further certify that I caused the Notice of Removal and all accompanying papers to be sent via both electronic mail and certified mail to the below address:

Robert S. Thompson, Esq.
Logan – Thompson, P.C.
30 2nd St. NW
Cleveland, TN, 37311
*Attorney for Plaintiffs*

**MORGAN, AKINS & JACKSON, PLLC**

<u>    /s/ B. Duane Willis                              </u>
B. DUANE WILLIS, ESQUIRE
Tennessee BPR Number: 019657
10 Burton Hills Boulevard
Suite 210
Nashville, TN 37215
Phone: 612.829.5995
Facsimile: 615.829.5992
Email: dwillis@morganakins.com
*Counsel for Defendant, Delta Air Lines Inc. i/s/h/a*
*"Delta Airlines, Inc."*

Date: <u>February 3, 2025</u>

14

# Exhibit A

# IN THE CIRCUIT COURT OF BRADLEY COUNTY, TENNESSEE

WILLIAM EPPERSON
AND NATALYA EPPERSON,

        Plaintiffs,

vs.

DELTA AIR LINES, INC.,

        Defendant.

VIA CERTIFIED MAIL

Docket No:_____

Judge _____

**SUMMONS**

**TO DEFENDANT:   DELTA AIR LINES, INC.**
**OTHER SERVICE INFORMATION: Please serve Delta Air Lines, Inc. through its registered agent for service of process Corporation Service Company, 2908 Poston Avenue, Nashville, TN 37203-1312**

You are summoned and required to Answer and make defense to a Complaint herewith served upon you.  Your Answer to the Complaint must be filed and served upon plaintiff's attorney on or before thirty (30) days after service of this Summons and Complaint upon you, exclusive of the day of service.  Your Answer must be filed in the OFFICE OF THE CLERK OF COURT, Bradley County Courthouse.   You are also required to serve a copy of your Answer upon the plaintiff's attorney, or the *pro se* plaintiff as set out below.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

      **ISSUED** this _____ day of _____, 2024.

                          _____, CLERK

                BY:     _____, DEPUTY   CLERK

| | |
|---|---|
| **LOGAN – THOMPSON, P.C.**<br>**ROBERT S. THOMPSON  BPR#012832**<br>Plaintiffs' Attorneys<br>PO Box 191<br>Cleveland, TN 37364-0191<br>(423) 476-2251 | NOTICE TO DEFENDANT(S)<br>Tennessee Code Annotated §26-2-103 provides a $10,000.00 personal property exemption from execution or seizure to satisfy a judgment.  If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk.  The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list.  Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books.  Should any of these items be seized you, would have the right to recover them.  If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. |

**RETURN**

I, ___(please print your name)___ , received this Summons on the ____ day of _____,2024.

[ ]    I served this Summons and Complaint in the following manner to:
        Signature: _____
        Printed Name: _____
        Address: _____
        Telephone Number: _____

[ ]    I failed to serve this summons within 30 days after its issuance because:
_____

                        Process Server _____
                        Address of Process Server: _____
                                        _____

                        Telephone Number of Process Server: _____

Sworn to and subscribed before me this _____ day of _____, 2024.

_____ My Commission Expires:_____

# IN THE CIRCUIT COURT FOR BRADLEY COUNTY, TENNESSEE

WILLIAM EPPERSON, and )
NATALYA EPPERSON, )
)
        Plaintiffs, )    Docket No. V-24-732
)
    v. )    Jury Demand
)
DELTA AIR LINES, INC., )    Judge: Stop
)
        Defendant. )

## COMPLAINT

Come now the Plaintiffs, William "Gray" Epperson and wife Natalya Epperson and, for their action against the Defendant, Delta Air Lines, Inc., state as follows:

## PARTIES

1)    Plaintiffs William "Gray" Epperson and Natalya Epperson (hereinafter "Plaintiffs") are residents of Cleveland, Tennessee, residing at 934 Anatole Court, Cleveland, Tennessee 37312.

2)    Defendant Delta Air Lines, Inc., (hereinafter "Delta" or "Defendant") is a corporation duly licensed to do business in New York with its principal location at 1030 Delta Boulevard, Atlanta, Georgia 30354-1989 and operating offices in New York City at 1 Delta Terminal Suite 2, Flushing, New York 11371.

## JURISDICTION & VENUE

3)    Subject matter jurisdiction is proper in this Court pursuant to *Tennessee Code Annotated* § 16-10-101 *et seq.*

4)    Venue is proper in this Court pursuant to *Tennessee Code Annotated* § 20-4-101 because the facts giving rise to this complaint occurred in Bradley County, Tennessee.

## FACTS & ALLEGATIONS

5)     On or about June 27, 2024, Plaintiffs were traveling from Chattanooga, Tennessee (CHA) to Milan-Malpensa, Italy (MXP), through Atlanta, Georgia (ATL) and Queens, New York (JFK), on Delta flights DL5268, DL2398, and DL0184. The flight at issue is DL0184 from JFK to MXP.

6)     Upon acceptance of the passengers' bags along with their baggage fees, Defendant incurred the contractual obligation to not lose the baggage. Explicit in this fee was the agreement not to lose, damage, or delay delivery of the bag, as basic consideration for the bag fee ("Contract"). Pursuant to Defendant's duties under that Contract, Defendant was obligated to pay for the loss of the baggage and its content when lost while in Defendant's possession and custody.

7)     In addition to such Contract, Delta purports to impose its Contract of Carriage ("COC"), which it claims requires various conditions precedent to a lawsuit under the COC or the Contract. Such conditions provide: "No action shall lie in the case of damage to baggage unless the person entitled to delivery complains to the Carrier forthwith after the discovery of the damage, and, at the latest, within seven days from the date of receipt; and in the case of delay or loss, complaint must be made at the latest within 21 days from the date on which the baggage has been placed at his disposal (in the case of delay), or should have been placed at his disposal (in the case of loss). Every complaint must be made in writing and dispatched within the time aforesaid." As further set forth below, Plaintiffs complied with the conditions precedent.

8)     On June 27, 2024, Plaintiffs were each charged a fee of fifty-dollars ($50.00) for handling and delivery of their bags for the flight to Milan. Plaintiffs paid the fees and checked two bags each for arrival at Milan.

9) Upon arriving in Milan (MXP) on June 28, 2024, Plaintiffs discovered that all four pieces of luggage were missing. Plaintiffs immediately filed a delayed baggage report at the airport in Milan and were advised that the luggage was still at JFK. Plaintiffs were then advised that Delta would place their luggage on the next flight to Milan, which was scheduled to arrive the next morning on June 29, 2024, and their luggage would then be brought to the location where Plaintiffs were staying. However, Plaintiffs' luggage was not located within that time frame.

10) Additionally, representatives of Delta in Milan advised Plaintiffs that if they were not present on the day the courier attempted delivery of their luggage, the courier had no obligation to make another delivery attempt. As such, Plaintiffs cancelled their prepaid excursions and instead waited at their vacation rental to facilitate the courier's delivery.

11) For five days, at a great cost of time and money, Plaintiffs made endless telephone calls (around 48-50) and were placed on hold for hours in an effort to locate their lost luggage. Plaintiffs called several of Defendant's office locations in the United States and Milan but failed to receive any kind of progress update with regards to their missing luggage. Plaintiffs had no change of clothes or toiletries and had to cancel planned trips as they did not have the appropriate attire and could not leave the location where Plaintiffs were staying in fear of missing the luggage delivery. With the extreme discomfort of not knowing what happened to their lost luggage with their valuables in it, their vacation was ruined and uncomfortable.

12) On July 2, 2024, Plaintiffs' lost luggage was finally delivered. However, upon inspecting the luggage, Plaintiffs came to the shocking and disturbing discovery that several of their valuables were missing.

13) While in Delta's possession, Plaintiffs' luggage had been pilfered and $4,018.00 worth of personal property had been stolen. The missing items included a Louis Vuitton purse, two

new Ralph Lauren dresses, one Ralph Lauren blouse, an unopened bottle of Gucci cologne, and two pairs of new tennis shoes.

14) Plaintiffs immediately reported the theft of their valuables to Delta. At a cost of time and money, Plaintiffs again made numerous telephone calls to representatives of Delta in Milan and the United States in an effort to locate the stolen items or alternatively receive reimbursement. Again, Delta failed to provide Plaintiffs with any kind of assistance.

15) Between June 28, 2024 and August 13, 2024, Plaintiff sent Delta flight confirmations, baggage claim checks, delayed baggage reports, damage/missing property claim forms, reimbursement forms, and accompanying receipt and/or credit card statements of their stolen valuables.

16) In response, Defendant offered Plaintiffs $1,725.00 total which was supposed to reflect the Defendant's maximum liability for lost and/or damaged luggage claims based on the Montreal Convention and this amount represented Defendant's full and final settlement for Plaintiffs claim, even though that amount does not come close to the total value of Plaintiffs' stolen valuables, emotional trauma, and damage.

17) Plaintiffs spent their first five days of "vacation" dealing with their delayed baggage. Plaintiffs then spent the remaining fourteen days of "vacation" dealing with their stolen property. This caused Plaintiffs waiting time, inconvenience, stress, physical discomfort, humiliation, embarrassment, loss of vacation days, loss of money, pain, suffering, and damage. The acts and omissions of Delta and its servants and agents were done with intent to cause damage or were done recklessly and with knowledge that damage would probably result. Delta's servants or agents were acting within the scope of their employment, as trained by Delta, as alleged above.

18)     Plaintiffs were never reimbursed by Delta for their delayed luggage, stolen items, reasonable expenses incurred to the delay of a baggage, or the baggage fees they paid.

## CAUSES OF ACTION

### COUNT 1
### (DELAYED BAGGAGE UNDER MONTREAL CONVENTION)

19)     Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

20)     Under Article 19 of the Montreal Convention, Delta is liable for damage occasioned by delay in the carriage by air of baggage.

21)     Delta and its servants and agents failed to take all measures that could reasonably be required to avoid the damage to Plaintiffs. It was possible for Delta and its servants and agents to have taken such measures.

22)     Delta and its servants and agents failed to keep track of Plaintiffs' baggage, were unable to inform Plaintiffs as to its location, intentionally lied to Plaintiffs regarding the location and expected arrival of their baggage, failed to take suitable care to get Plaintiffs' baggage on their flight, or any flight to Milan, and repeatedly and intentionally lied to Plaintiffs regarding reimbursements, resulting in unnecessary waiting time, inconvenience, stress, physical discomfort, humiliation, embarrassment, loss of vacation days, loss of money, pain, suffering, and damage. The acts and omissions of Delta and its servants and agents were done with intent to cause damage or were done recklessly and with knowledge that damage would probably result. Delta's servants or agents were acting within the scope of their employment, as trained by Delta, as alleged above.

23)     The acts and omissions of Delta and its servants and agents were done with intent to cause damage or were done recklessly and with knowledge that damage would probably result.

Delta's servants or agents were acting within the scope of their employment, as trained by Delta, as alleged above.

24)     Delta is liable for damage occasioned by delay in the carriage by air of baggage. Because the damage resulted from an act or omission of Delta, its servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result, and the servants or agents were acting within the scope of their employment, the limitation on liability set forth in Article 22 of the Montreal Convention does not apply.

## COUNT 2
## (BREACH OF CONTRACT)

25)     Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

26)     The agreement between the Plaintiffs and the Defendant is governed, in part, by the Defendant's Contract of Carriage, a contract of adhesion unilaterally imposed by the Defendant.

27)     For Plaintiffs' June 27/28, 2024 trip, in exchange for the payment of a base fare plus fees and taxes, the Defendant agreed to transport Plaintiffs from CHA to MXP in the first class cabin, complete with all of the usual and customary amenities and benefits associated with premium cabin travel, including but not limited to transporting up to two (2) items of checked luggage weighing not more than seventy (70) pounds each, per passenger.

28)     Plaintiffs performed all conditions, covenants, and promises required of them by the contracts, including but not limited to paying the full amount of the airfare to the Defendant for the trip identified hereinabove.

29)     Defendant breached the contracts herein by failing to check Plaintiffs baggage for the flights on which they were traveling, and further breached the contracts by pilfering certain

items from Plaintiffs' checked baggage while said baggage was in the sole custody of the Defendant.

30)    The damage to Plaintiffs' baggage on June 27/28, 2024 was not due to *force majeure* or any circumstance beyond the Defendant's reasonable control.

31)    As a result of the Defendant's multiple breaches of contract, Plaintiffs have suffered substantial economic and non-economic injuries, in an amount to be proven at trial, but in no case less than Forty Five Thousand Dollars and 00/100 ($45,000.00).

## COUNT 3
### (REFUSAL TO REIMBURSE)

32)    Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

33)    On its website and in other places Delta represents and promises that it will reimburse passengers for "all reasonable expense[s] … incurred due to the delay of a passenger's bag."

34)    Based upon the promises of Delta and its servants and agents that Plaintiffs would be reimbursed, Plaintiffs purchased some new clothes and toiletries, cancelled prepaid excursions, and remained in their vacation rental for five days awaiting their luggage.

35)    Plaintiffs sent Delta a letter requesting reimbursement in the amount of $8,429.77 for their out-of-pocket expenses during the delay of their baggage. Attached to that letter were, among other things, copies of all the receipts for the purchase of their vacation rental, copies of all receipts for Plaintiffs' airline tickets, copies of all four baggage claim checks, and copies of the delayed baggage report completed at the airport in Milan. Delta has failed and refused to reimburse Plaintiffs any amount for their out-of-pocket expenses during the delay of their baggage.

36)     Additionally, on or about August 8, 2024, Plaintiffs sent Delta a Damage/Missing Property Claim Form requesting reimbursement in the amount of $4,018.00 for the total value of stolen items. Delta has failed and refused to reimburse Plaintiffs any amount for their stolen items.

37)     Plaintiffs have not been reimbursed for their stolen items or their out-of-pocket expenses incurred during the delay of their baggage.

## COUNT 4
## (UNJUST ENRICHMENT)

38)     Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

39)     Plaintiffs conferred a benefit upon Defendant when they paid the baggage fees and Defendant had knowledge of the benefit upon acceptance of the baggage fees.

40)     Imposition of these baggage fees enriches Defendant and increases its revenue because Plaintiffs paid Defendant monies for their checked baggage service.

41)     Defendant's retention of the baggage fees becomes unjust, however, when Defendant fails to check a passenger's bag for the flight on which he or she is traveling, particularly because Defendant self-imposed an obligation to check a passenger's bag for the flight on which he or she is traveling.

42)     By retaining the baggage fee in such instances, Defendant has been unjustly enriched under both state and federal common law.

43)     Plaintiffs were thereby damaged in an amount to be determined at trial.

## COUNT 5
## (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

44)     Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

45)     Implicit in every agreement is the covenant of good faith and fair dealing.

46)     When Defendant collects a baggage fee for checked baggage, acceptance of that fee from the passenger obligates it to check the passenger's baggage for the flight on which he or she is traveling.

47)     In failing to refund the baggage fee to Plaintiffs whose baggage it failed to check on their respective flight, Defendant breached the covenant of good faith and fair dealing under both state and federal common law.

48)     Plaintiffs were thereby damaged in an amount to be determined at trial.

## COUNT 6
### (FAILURE TO EXERCISE REASONABLE CARE)

49)     Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

50)     Delta failed to exercise reasonable care in the handling and transit of the Plaintiffs' luggage.

51)     As a proximate result of Delta's failure to exercise reasonable care, all without negligence or fault on the part of the Plaintiffs, Plaintiffs have been damaged.

## COUNT 7
### (NEGLIGENCE)

52)     Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

53)     Defendant owed Plaintiffs a duty which arises out of a financial contract.

54)     Defendant breached that duty when it failed to perform under the contract. Defendant failed to secure and protect Plaintiffs' luggage with reasonable care. Defendant failed

to transport Plaintiffs' luggage from New York to Milan as stipulated by the contract. As a result, Defendant lost, misdirected, and pilfered Plaintiffs' luggage.

55)     Plaintiffs suffered injury because of Defendant's failure to act with reasonable care. Defendant is the proximate and legal cause of Plaintiffs' injury.

## COUNT 8
### (GROSS NEGLIGENCE.)

56)     Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

57)     Plaintiffs' luggage was in the custody and control of Defendant.

58)     Delta does not properly screen and monitor its employees and other parties handling the luggage of passengers.

59)     As a result of Defendant's gross negligence, Plaintiffs are entitled to punitive damages.

## COUNT 9
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

60)     Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

61)     Delta and its servants and agents pursued an outrageous course of conduct, intentionally and/or recklessly, proximately causing Plaintiffs severe emotional distress, shock, and other painful, depressive, and debilitating emotions.

62)     Delta's course of conduct is particularly outrageous due to the special relationship between Plaintiffs and Delta and its servants and agents as a common carrier.

63)     Delta and its servants and agents intended to cause, or acted in reckless disregard of the likelihood of causing, severe emotional distress, shock, and other painful, depressive, and

debilitating emotions to Plaintiffs, or had reasonable expectations that severe emotional distress, shock, and other painful, depressive, and debilitating emotions would ensue.

64)     The conduct of Delta and its servants and agents was outrageous and shocks the conscience of reasonable persons.

65)     As a direct result of the outrageous conduct of Delta and its servants and agents, Plaintiffs suffered and continue to suffer injuries.

66)     In addition, punitive damages should be awarded to Plaintiffs against Delta and its servants and agents because their conduct was willful, wanton, intentional and in reckless disregard of the consequences, especially given the relationship of Delta and its servants and agents as a common carrier.

## COUNT 10
## (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

67)     Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

68)     Delta and its servants and agents pursued an outrageous course of conduct, and should have realized that their conduct involved an unreasonable risk of causing Plaintiffs severe emotional distress, shock, and other painful emotions.

69)     Delta's course of conduct is particularly outrageous due to the special relationship between Plaintiffs and Delta and its servants and agents as a common carrier.

70)     From facts known to Delta and its servants and agents, they should have realized that severe emotional distress, shock, and other painful, depressive, and debilitating emotions, if it were caused, might result in harm to Plaintiffs.

71)     Delta and its servants and agents intended to cause, or acted in reckless disregard of the likelihood of causing, severe emotional distress, shock, and other painful, depressive, and

debilitating emotions to Plaintiffs, or had reasonable expectations that severe emotional distress, shock, and other painful, depressive, and debilitating emotions would ensue.

72) The conduct of Delta and its servants and agents was outrageous and shocks the conscience of reasonable persons.

73) As a direct result of the outrageous conduct of Delta and its servants and agents, Plaintiffs suffered and continue to suffer injuries.

74) In addition, punitive damages should be awarded to Plaintiffs against Delta and its servants and agents because their conduct was willful, wanton, intentional, and in reckless disregard of the consequences, especially given the relationship of Delta and its servants and agents as a common carrier.

## COUNT 11
## (NEGLIGENT/INTENTIONAL MISREPRESENTATION)

75) Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

76) Defendant misrepresented the character, benefit, and quality of its services to entice Plaintiffs into purchasing tickets from Defendant.

77) Plaintiffs relied on these representations to their detriment.

78) Plaintiffs sustained damages in that they had to replace the contents of their luggage that were stolen while in Defendant's sole care and custody.

79) At the time of the act, Defendant knew or should have known the mental anguish the act would engender upon Plaintiffs.

80) As a direct result of Defendant's knowing and intentional misconduct, Defendant is liable to Plaintiffs for damages of up to three times the amount of the damages permitted by the Tennessee Consumer Protection Act.

81) Additionally, this honorable Court should impose treble damages on Defendant for mental anguish. The foregoing representations blatantly violate the Tennessee Consumer Protection Act and Federal Trade Practices Act.

82) Defendant converted Plaintiffs' luggage and property within when Defendant was unauthorized and wrongfully assumed and exercised dominion and control over the personal property of Plaintiffs to the exclusion of, or inconsistent with, the Plaintiffs' rights.

## COUNT 12
## (CONVERSION)

83) Plaintiffs incorporate the allegations contained in the preceding paragraphs, as if specifically set forth herein verbatim.

84) At all times alleged herein, Plaintiffs were the owners of the property, or had the right to possession of that property, which was unlawfully converted by Defendant.

85) At all times alleged herein, Defendant wrongly took Plaintiffs' property, without permission or authorization, for its own personal and wrongful use. Defendant was a direct beneficiary of the conversion.

86) As a legal result of the conversion by Defendant, Plaintiffs suffered damages, including but not limited to, the value of the personal property lost, as well as the time and money expended to recover said wrongfully converted property, including, but not limited to, their attorneys' fees and costs.

## **PRAYERS FOR RELIEF**

**WHEREFORE,** Plaintiffs demand the following relief:

1) For monetary damages, in the precise amount to be proven at trial, together with applicable interest, costs, and attorney fees;

2) For consequential damages, based on all injuries and losses that proximately flowed from Defendant's violations of law, including the substantial lost property suffered by Plaintiffs while they were subjected to the negligent conduct of the Defendant, in an amount according to proof at trial;

3) For all reasonable attorneys' fees and costs that Plaintiffs have been forced to incur in preparing, filing, and prosecuting this suit; and

4) For any such further relief that the Court deems to be just and proper.

5) That Plaintiffs be awarded such other and further relief as the Court deems equitable or proper.

Respectfully submitted,

LOGAN-THOMPSON, P.C.

By _____
ROBERT S. THOMPSON (BPR#012832)
*Attorney for Plaintiffs*
30 2nd St. NW
Cleveland, TN 37311
423/476-2251
423/472-0211
rthompson@loganthompsonlaw.com

## COST BOND

We, the undersigned Principal and Surety, do hereby acknowledge ourselves as security for the costs of this cause, not to exceed $1,000.00.

WILLIAM EPPERSON AND WIFE
NATALYA EPPERSON
PRINCIPALS BY ATTORNEY

LOGAN-THOMPSON, P.C., by

SURETY _____

STATE OF TENNESSEE, COUNTY OF BRADLEY
I, Gayla H. Miller, Clerk of the Circuit Court of said
County, do hereby certify that the foregoing is a true
copy of the _____ as same as
appears on file in my office.
WITNESS my hand and Official Seal at office in Cleveland,
Tennessee. This 30th day of December
20___ GAYLA H. MILLER
_____ Deputy Clerk

14

# Exhibit B

## CONVENTION FOR THE UNIFICATION OF CERTAIN RULES
## FOR INTERNATIONAL CARRIAGE BY AIR
## DONE AT MONTREAL ON 28 MAY 1999

| | |
|---|---|
| **Entry into force:** | The Convention entered into force on 4 November 2003*. |
| **Status:** | 140 parties. |

| State | Date of signature | Date of deposit of instrument of ratification, acceptance (A), approval (AA) or accession (a) | Date of entry into force |
|---|---|---|---|
| Albania | - | 20/10/04 (a) | 19/12/04 |
| Argentina (22) | - | 16/12/09 (a) | 14/2/10 |
| Armenia | - | 16/04/10 (a) | 15/6/10 |
| Australia | - | 25/11/08 (a) | 24/1/09 |
| Austria (10) | - | 29/4/04 (a) | 28/6/04 |
| Azerbaijan (26) | - | 10/2/15 (a) | 11/4/15 |
| Bahamas | 28/5/99 | - | - |
| Bahrain | - | 2/2/01(a) | 4/11/03 |
| Bangladesh | 28/5/99 | 2/9/22 | 1/11/22 |
| Barbados | - | 2/1/02 (a) | 4/11/03 |
| Belgium (1)(15) | 28/5/99 | 29/4/04 | 28/6/04 |
| Belize | 28/5/99 | 24/8/99 | 4/11/03 |
| Benin | 28/5/99 | 30/3/04 | 29/5/04 |
| Bolivia (Plurinational State of) | 28/5/99 | 6/5/15 | 5/7/15 |
| Bosnia and Herzegovina | - | 9/3/07 (a) | 8/5/07 |
| Botswana | - | 28/3/01 (a) | 4/11/03 |
| Brazil | 3/8/99 | 19/5/06 | 18/7/06 |
| Brunei Darussalam (36) | - | 18/3/20 (a) | 17/5/20 |
| Bulgaria | - | 10/11/03 (a) | 9/1/04 |
| Burkina Faso (37) | 28/5/99 | 25/6/13 | 24/8/13 |
| Cabo Verde | - | 23/8/04 (a) | 22/10/04 |
| Cambodia | 28/5/99 | - | - |
| Cameroon | 27/9/01 | 5/9/03 | 4/11/03 |
| Canada (6) | 1/10/01 | 19/11/02 | 4/11/03 |
| Central African Republic | 25/9/01 | - | - |
| Chad | - | 12/7/17 (a) | 10/9/17 |
| Chile (21) | 28/5/99 | 19/3/09 | 18/5/09 |
| China (18) | 28/5/99 | 1/6/05 | 31/7/05 |
| Colombia | 15/12/99 | 28/3/03 | 4/11/03 |
| Congo | - | 19/12/11 (A) | 17/2/12 |
| Cook Islands | - | 22/5/07 (a) | 21/7/07 |
| Costa Rica | 20/12/99 | 9/6/11 | 8/8/11 |
| Côte d'Ivoire | 28/5/99 | 4/2/15 | 5/4/15 |
| Croatia | - | 23/1/08 (a) | 23/3/08 |
| Cuba | 28/5/99 | 14/10/05 | 13/12/05 |
| Cyprus | - | 20/11/02 (a) | 4/11/03 |
| Czechia (3) | 28/5/99 | 16/11/00 | 4/11/03 |
| Democratic Republic of the Congo | - | 21/7/14 (a) | 19/9/14 |
| Denmark (1)(11) | 28/5/99 | 29/4/04 | 28/6/04 |
| Dominican Republic | 28/5/99 | 21/9/07 | 20/11/07 |
| Ecuador | - | 27/6/06 (a) | 26/8/06 |
| Egypt | - | 24/2/05 (A) | 25/4/05 |
| El Salvador | - | 7/11/07 (a) | 6/1/08 |
| Equatorial Guinea | - | 18/9/15 (AA) | 17/11/15 |
| Estonia | 4/2/02 | 10/4/03 | 4/11/03 |
| Eswatini | 28/5/99 | 23/11/16 | 22/1/17 |
| Ethiopia | - | 23/4/14 (a) | 22/6/14 |
| Fiji | - | 10/11/15 (a) | 9/1/16 |
| Finland (4) | 9/12/99 | 29/4/04 | 28/6/04 |

Convention for the Unification of                     - 2 -
Certain Rules for International Carriage by Air
Montreal, 28 May 1999

| State | Date of signature | Date of deposit of instrument of ratification, acceptance (A), approval (AA) or accession (a) | Date of entry into force |
|-------|-------------------|-----------------------------------------------------------------------------------------------|--------------------------|
| France (1) | 28/5/99 | 29/4/04 | 28/6/04 |
| Gabon | 28/5/99 | 4/2/14 | 5/4/14 |
| Gambia | - | 10/3/04 | 9/5/04 |
| Georgia | - | 20/12/10 (a) | 18/2/11 |
| Germany (1)(12) | 28/5/99 | 29/4/04 | 28/6/04 |
| Ghana | 28/5/99 | 4/6/18 | 3/8/18 |
| Greece (1) | 28/5/99 | 22/7/02 | 4/11/03 |
| Guatemala (28) | - | 7/6/16 (a) | 6/8/16 |
| Guyana | - | 23/12/14 (a) | 21/2/15 |
| Honduras | - | 25/11/15 (a) | 24/01/16 |
| Hungary | - | 8/11/04 (a) | 7/1/05 |
| Iceland | 28/5/99 | 17/6/04 | 16/8/04 |
| India | - | 1/5/09 (a) | 30/6/09 |
| Indonesia | - | 20/3/17 (a) | 19/5/17 |
| Ireland (1) | 16/8/00 | 29/4/04 | 28/6/04 |
| Israel (24) | - | 19/1/11 (a) | 20/3/11 |
| Italy (1) | 28/5/99 | 29/4/04 | 28/6/04 |
| Jamaica | 28/5/99 | 7/7/09 | 5/9/09 |
| Japan (8) | - | 20/6/00 (A) | 4/11/03 |
| Jordan | 5/10/00 | 12/4/02 | 4/11/03 |
| Kazakhstan | - | 2/7/15 (a) | 31/8/15 |
| Kenya | 28/5/99 | 07/1/02 | 4/11/03 |
| Kuwait | 28/5/99 | 11/6/02 | 4/11/03 |
| Latvia | - | 17/12/04 (A) | 15/2/05 |
| Lebanon | - | 15/3/05 (a) | 14/5/05 |
| Lithuania (17) | 28/5/99 | 30/11/04 | 29/1/05 |
| Luxembourg (2) | 29/2/00 | 29/4/04 | 28/6/04 |
| Madagascar | 28/5/99 | 28/12/06 | 26/2/07 |
| Malaysia (20) | - | 31/12/07 (a) | 29/2/08 |
| Maldives | - | 31/10/05 (a) | 30/12/05 |
| Mali | - | 16/1/08 (a) | 16/3/08 |
| Malta | 28/5/99 | 5/5/04 | 4/7/04 |
| Mauritius | 28/5/99 | 2/2/17 | 3/4/17 |
| Mexico | 28/5/99 | 20/11/00 | 4/11/03 |
| Monaco | 28/5/99 | 18/8/04 | 17/10/04 |
| Mongolia | - | 5/10/04 (a) | 4/12/04 |
| Montenegro (23) | - | 15/11/10 (a) | 16/3/10 |
| Morocco | - | 15/4/10 (a) | 14/6/10 |
| Mozambique | 28/5/99 | 27/1/14 | 28/3/14 |
| Namibia | 28/5/99 | 27/9/01 | 4/11/03 |
| Nepal (33) | - | 16/10/18 (a) | 15/12/18 |
| Netherlands (14) | 30/12/99 | 29/4/04 | 28/6/04 |
| New Zealand (5) | 13/7/01 | 18/11/02 | 4/11/03 |
| Nicaragua | | 6/9/22 (a) | 5/11/22 |
| Niger | 28/5/99 | 31/1/18 | 1/4/18 |
| Nigeria | 28/5/99 | 10/5/02 | 4/11/03 |
| North Macedonia | - | 15/5/00 (a) | 4/11/03 |
| Norway | - | 29/4/04 (a) | 28/6/04 |
| Oman | - | 28/5/07 (a) | 27/7/07 |
| Pakistan | 28/5/99 | 19/12/06 | 17/2/07 |
| Panama | 28/5/99 | 13/9/02 | 4/11/03 |
| Paraguay | 17/3/00 | 29/3/01 | 4/11/03 |
| Peru | 7/9/99 | 11/4/02 | 4/11/03 |

Convention for the Unification
of Certain Rules for International Carriage by Air
Montreal, 28 May 1999

| State | Date of signature | Date of deposit of instrument of ratification, acceptance (A), approval (AA) or accession (a) | Date of entry into force |
|---|---|---|---|
| Philippines (27) | - | 19/10/15 (a) | 18/12/15 |
| Poland | 28/5/99 | 17/1/06 | 18/3/06 |
| Portugal (1) | 28/5/99 | 28/2/03 | 4/11/03 |
| Qatar (16) | - | 15/11/04 (a) | 14/1/05 |
| Republic of Korea | - | 30/10/07 (a) | 29/12/07 |
| Republic of Moldova | - | 17/3/09 (a) | 16/5/09 |
| Romania | 18/11/99 | 20/3/01 | 4/11/03 |
| Russian Federation (30) | - | 22/6/17 (a) | 21/8/17 |
| Rwanda | - | 20/10/15 (a) | 19/12/15 |
| Saint Vincent and the Grenadines | - | 29/3/04 (a) | 28/5/04 |
| Saudi Arabia | 28/5/99 | 15/10/03 | 14/12/03 |
| Senegal | 28/5/99 | 7/9/16 | 6/11/16 |
| Serbia | - | 3/2/10 (a) | 4/4/10 |
| Seychelles | - | 13/9/10 (a) | 12/11/10 |
| Sierra Leone | - | 25/11/15 (a) | 24/01/16 |
| Singapore (19) | - | 17/9/07 (a) | 16/11/07 |
| Slovakia | 28/5/99 | 11/10/00 | 4/11/03 |
| Slovenia | 28/5/99 | 27/3/02 | 4/11/03 |
| South Africa | 28/5/99 | 22/11/06 | 21/1/07 |
| Spain (13) | 14/1/00 | 29/4/04 | 28/6/04 |
| Sri Lanka (34) | - | 19/11/18 (a) | 18/1/19 |
| Sudan | 28/5/99 | 18/8/17 | 17/10/17 |
| Sweden (1) | 27/8/99 | 29/4/04 | 28/6/04 |
| Switzerland | 28/5/99 | 7/7/05 | 5/9/05 |
| Syrian Arab Republic | - | 18/7/02 (a) | 4/11/03 |
| Thailand (31) | - | 3/8/17 (a) | 2/10/17 |
| Togo (29) | 28/5/99 | 27/9/16 | 26/11/16 |
| Tonga | - | 20/11/03 (a) | 19/1/04 |
| Tunisia | - | 21/9/18 (a) | 20/11/18 |
| Türkiye (25) | 28/5/99 | 25/1/11 | 26/3/11 |
| Uganda | - | 28/11/17 (a) | 27/1/18 |
| Ukraine | - | 6/3/09 (a) | 5/5/09 |
| United Arab Emirates | - | 7/7/00 (a) | 4/11/03 |
| United Kingdom (1) | 28/5/99 | 29/4/04 | 28/6/04 |
| United Republic of Tanzania | - | 11/2/03 (a) | 4/11/03 |
| United States (7) | 28/5/99 | 5/9/03 | 4/11/03 |
| Uruguay | 9/6/99 | 4/2/08 | 4/4/08 |
| Vanuatu | - | 9/11/05 (a) | 8/1/06 |
| Viet Nam (32) | - | 27/9/18 (a) | 26/11/18 |
| Zambia | 28/5/99 | - | - |
| Zimbabwe | - | 29/8/24 (a) | 28/10/24 |
| | | | |
| **Regional Economic Integration Organisations** | - | - | - |
| European Union (9) (35) | 9/12/99 | 29/4/04 (AA) | 28/6/04 |

\*  As a result of the fourth review of the limits of liability conducted by ICAO in accordance with Article 24, the rounded revised limits, effective as of 28 December 2024, in Special Drawing Rights (SDRs), are:

—  26 SDRs per kilogramme in the case of destruction, loss, damage or delay in relation to the carriage of cargo (Article 22, paragraph 3)

—  1 519 SDRs for each passenger in case of destruction, loss, damage or delay with respect to baggage (Article 22, paragraph 2)

—  6 303 SDRs for each passenger in relation to damage caused by delay in the carriage of persons (Article 22, paragraph 1)

Convention for the Unification of                          - 4 -
Certain Rules for International Carriage by Air
Montreal, 28 May 1999

— 151 880 SDRs for each passenger for damage sustained in case of death or bodily injury (for the first tier) (Article 21, paragraph 1)

(1) Upon signature of the Convention, this State, Member State of the European Community, declared that "in accordance with the Treaty establishing the European Community, the Community has competence to take actions in certain matters governed by the Convention".

(2) On 3 October 2000, ICAO received from Luxembourg the following declaration: "The Grand Duchy of Luxembourg, Member State of the European Community, declares that in accordance with the Treaty establishing the European Community, the Community has competence to take actions in certain matters governed by the Convention".

(3) Upon deposit of its instrument of ratification, Czechia notified ICAO that "as a Member of the International Monetary Fund, [the Czech Republic] shall proceed in accordance with Article 23, paragraph 1 of the Convention".

(4) By a Note dated 13 July 2000, Finland transmitted a declaration dated 7 July 2000 signed by the Minister for Foreign Trade, setting forth the wording quoted in note (1) above.

(5) Upon deposit of its instrument of accession (deemed to be an instrument of ratification), New Zealand declared "that this accession shall extend to Tokelau".

(6) At the time of ratification, Canada made the following declaration: "Canada declares, in accordance with Article 57 of the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal on 28 May 1999 and signed by Canada on 1 October 2001, that the Convention does not apply to the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by Canada, the whole capacity of which has been reserved by or on behalf of such authorities [Article 57(b)]."

(7) The instrument of ratification of the United States contains the following declaration:
"Pursuant to Article 57 of the Convention, the United States of America declares that the Convention shall not apply to international carriage by air performed and operated directly by the United States of America for non-commercial purposes in respect to the functions and duties of the United States of America as a sovereign State."

(8) By a Note dated 24 October 2003 signed by the Minister for Foreign Affairs, Japan informed ICAO "that, in accordance with Article 57(a) of the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal on 28 May 1999, the Government of Japan declares that this Convention shall not apply to international carriage by air performed and operated directly by the Government of Japan for non-commercial purposes in respect to its functions and duties as a sovereign State."

(9) On 9 February 2010, the Council of the European Union deposited with ICAO a note verbale referring to the entry into force, on 1 December 2009, of the Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community, and stating: "As a consequence, as from 1 December 2009, the European Union has replaced and succeeded the European Community . . . and has exercised all rights and assumed all obligations of the European Community whilst continuing to exercise existing rights and assume obligations of the European Union."

The instrument of approval by the European Community deposited on 29 April 2004 contains the following declaration: "Declaration concerning the competence of the European Community with regard to matters governed by the Convention of 28 May 1999 for the unification of certain rules for international carriage by air (the Montreal Convention):

1.  The Montreal Convention provides that Regional Economic Integration Organisations constituted by sovereign States of a given region, which have competence in respect of certain matters governed by this Convention, may become parties to it.

- 5 -

Convention for the Unification
of Certain Rules for International Carriage by Air
Montreal, 28 May 1999

2. The current Member States of the European Community are the Kingdom of Belgium, the Kingdom of Denmark, the Federal Republic of Germany, the Hellenic Republic, the Kingdom of Spain, the French Republic, Ireland, the Italian Republic, the Grand Duchy of Luxembourg, the Kingdom of the Netherlands, the Republic of Austria, the Portuguese Republic, the Republic of Finland, the Kingdom of Sweden and the United Kingdom of Great Britain and Northern Ireland.

3. This declaration is not applicable to the territories of the Member States in which the Treaty establishing the European Community does not apply and is without prejudice to such acts or positions as may be adopted under the Convention by the Member States concerned on behalf of and in the interests of those territories.

4. In respect of matters covered by the Convention, the Member States of the European Community have transferred competence to the Community for damage sustained in case of death or injury of passenger. The Member States have also transferred competence for liability for damage caused by delay and in the case of destruction, loss, damage or delay in the carriage of baggage. This includes requirements on passenger information and a minimum insurance requirement. Hence, in this field, it is for the Community to adopt the relevant rules and regulations (which the Member States enforce) and within its competence to enter into external undertakings with third States or competent organisations*.

5. The exercise of competence which the Member States have transferred to the Community pursuant to the EC Treaty is, by its nature, liable to continuous development. In the framework of the Treaty, the competent institutions may take decisions which determine the extent of the competence of the European Community. The European Community therefore reserves the right to amend the present declaration accordingly, without this constituting a prerequisite for the exercise of its competence with regard to matters governed by the Montreal Convention.

_____
*Sources:
1) Council Regulation (EC) No 2027/97 of 9 October 1997 on air carrier liability in the event of accidents, Official Journal of the European Union, L 285, 17.10.1997, p. 1;
2) Regulation (EC) No 889/2002 of the European Parliament and of the Council of 13 May 2002 amending Council Regulation (EC) No 2027/97 on air carrier liability in the event of accidents, Official Journal of the European Union, L 140, 30.05.2002, p. 2.''

(10) The instrument of accession by Austria contains the following declaration:
"The Republic of Austria declares according to Article 57 of the Convention for the Unification of Certain Rules for International Carriage by Air of 28 May 1999 that this Convention shall not apply to:
a) international carriage by air performed and operated directly by the Republic of Austria for non-commercial purposes in respect to its functions and duties as a sovereign State;
b) the carriage of persons, cargo and baggage for the military authorities on aircraft registered in or leased by the Republic of Austria, the whole capacity of which has been reserved on behalf of such authorities."

(11) The instrument of ratification by Denmark contains a declaration that until later decision, the Convention will not be applied to the Faroe Islands.

(12) The instrument of ratification by Germany was accompanied by the following declaration:
"In accordance with Article 57 of the Convention of for the Unification of Certain Rules for International Carriage by Air of 28 May 1999, the Federal Republic of Germany declares that the Convention shall not apply to international carriage by air performed and operated directly by the Federal Republic of Germany for non-commercial purposes in respect to its functions and duties as a sovereign State or to the carriage of persons, cargo and baggage for the military authorities of the Federal Republic of Germany on aircraft registered in or leased by the Federal Republic of Germany, the whole capacity of which has been reserved by or on behalf of such authorities."

(13) The instrument of ratification by Spain contains the following declarations:
"The Kingdom of Spain, Member State of the European Community, declares that in accordance with the Treaty establishing the European Community, the Community has competence to take actions in certain matters governed by the Convention."

Convention for the Unification of
Certain Rules for International Carriage by Air          - 6 -
Montreal, 28 May 1999

"In accordance with the provisions of Article 57, the Convention shall not apply to:
a)   international carriage by air performed and operated directly by Spain for non-commercial purposes in respect to its functions and duties as a sovereign State;
b)   the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by Spain, the whole capacity of which has been reserved by or on behalf of such authorities."

(14)   The instrument of ratification by the Kingdom of the Netherlands states that the ratification is for the Kingdom in Europe.

By a Note dated 29 April 2004 from the Ministry of Foreign Affairs, the Netherlands transmitted to ICAO the following declaration:  "The Kingdom of the Netherlands, Member State of the European Community, declares that in accordance with the Treaty establishing the European Community, the Community has competence to take actions in certain matters governed by the Convention".

By Notes dated 22 April and 8 September 2016, the Kingdom of the Netherlands extended the Convention to the Caribbean part of the Netherlands (the islands of Bonaire, Sint Eustatius and Saba), with effect from 1 October 2016.

(15)   By a Note dated 15 July 2004 from the Minister of Foreign Affairs, Belgium transmitted to ICAO the following declaration in accordance with Article 57:
"the Convention does not apply to:
a)   international carriage by air performed and operated directly by Belgium for non-commercial purposes in respect to its functions and duties as a sovereign State;
b)   the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by Belgium, the whole capacity of which has been reserved by or on behalf of such authorities."

(16)   In its instrument of accession, Qatar confirmed the application of the following declaration in accordance with Article 57:
"the Convention does not apply to:
a)   international carriage by air performed and operated directly by that State Party for non-commercial purposes in respect to its functions and duties as a sovereign State, and/or
b)   the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by that State Party, the whole capacity of which has been reserved by or on behalf of such authorities."

(17)   The instrument of ratification by Lithuania contains the following declarations:
". . . in accordance with Article 57 . . . , the Seimas of the Republic of Lithuania declares that this Convention shall not apply to international carriage by air performed and operated directly by the Republic of Lithuania for non-commercial purposes in respect to its functions and duties as a sovereign State; and also shall not apply to the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by the Republic of Lithuania, the whole capacity of which has been reserved by or on behalf of such authorities."

". . . in accordance with the Treaty establishing the European Community, the Seimas of the Republic of Lithuania declares that the Community has competence to take actions in certain matters governed by the Convention."

(18)   (A) The instrument of ratification by China contains the following declaration:
"The Convention does not apply in the Hong Kong Special Administrative Region of the People's Republic of China until notified otherwise by the Government of the People's Republic of China."
(B) In addition, the Representative of China on the Council of ICAO made the following declaration at the time of deposit of the instrument of ratification:
"The Convention applies in the Macao Special Administrative Region of the People's Republic of China."
(C) By a letter dated 20 October 2006, the Representative of China on the Council of ICAO made the following statement on behalf of the Government of the People's Republic of China (PRC):
"Article 153 of the Basic Law of the Hong Kong Special Administrative Region of the PRC provides that the application to the Hong Kong Special Administrative Region of the PRC of international agreements to which

- 7 -

Convention for the Unification
of Certain Rules for International Carriage by Air
Montreal, 28 May 1999

the PRC is or becomes a party shall be decided by the Central People's Government in accordance with the circumstances and needs of the Region and after seeking the views of the Government of the Region.
In consultation with the Government of the Hong Kong Special Administrative Region, the Government of the PRC has decided to apply the Convention in the Hong Kong Special Administrative Region of the PRC from the date of December 15, 2006."

(19)    The instrument of accession by Singapore contains the following declaration in accordance with Article 57:
"the Convention shall not apply to:
a)    international carriage by air performed and operated directly by the Republic of Singapore for non-commercial purposes in respect to its functions and duties as a sovereign State; and
b)    the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by the Republic of Singapore, the whole capacity of which has been reserved by or on behalf of such authorities."

(20)    The instrument of accession by Malaysia is accompanied by the following declaration:
"Malaysia, in accordance with Article 57 (b) of the Montreal Convention, declares that the Convention shall not apply to the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by Malaysia, the whole capacity of which has been reserved by or on behalf of such authorities."

(21)    The instrument of ratification by Chile contains the following declaration in accordance with Article 57 (b):
"The Republic of Chile declares that the Convention shall not apply to the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by that State Party, the whole capacity of which has been reserved by or on behalf of such authorities."

(22)    The instrument of accession by Argentina contains the following "interpretative declaration": "For the Argentine Republic, the term 'bodily injury' in Article 17 of this treaty includes mental injury related to bodily injury, or any other mental injury which affects the passenger's health in such a serious and harmful way that his or her ability to perform everyday tasks is significantly impaired."

(23)    The instrument of accession by Montenegro contains the following declaration in accordance with Article 57:
"this Convention shall not apply to:
a)    international carriage by air performed and operated directly by Montenegro for non-commercial purposes in respect to its functions and duties as a sovereign State;
b)    the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by Montenegro, the whole capacity of which has been reserved by or on behalf of such authorities."

(24)    The instrument of accession by Israel contains the following declaration in accordance with Article 57:
"The Convention shall not apply to:
a)    international carriage by air performed and operated directly by the State of Israel for non-commercial purposes in respect to its functions and duties as a sovereign State; and/or
b)    the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by the State of Israel, the whole capacity of which has been reserved by or on behalf of such authorities."

(25)    The instrument of ratification by Türkiye contains the following declaration in accordance with Article 57:
"The said Convention shall not apply to international carriage by air performed and operated directly by the Republic of Turkey for non-commercial purposes in respect to its functions and duties as a Sovereign State and to the carriage of persons, cargo and baggage for Turkish military authorities on aircraft registered in or leased by the Republic of Turkey, the whole capacity of which has been reserved by or on behalf of such authorities."

(26)    The instrument of ratification by Azerbaijan, deemed to be an instrument of accession, contains the following declaration:
"The Republic of Azerbaijan, in accordance with Article 57 of the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal on May 28, 1999, declares that the provisions of the Convention shall not apply to:
a)    international carriage by air performed and operated directly by the Republic of Azerbaijan for non-commercial purposes in respect to its functions and duties as a sovereign State; and

Convention for the Unification of          - 8 -
Certain Rules for International Carriage by Air
Montreal, 28 May 1999

b)    the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by the Republic of Azerbaijan, the whole capacity of which has been reserved by or on behalf of such authorities."

(27)    The instrument of accession by the Philippines contains the following declaration in accordance with Article 57:
"the Convention shall not apply to:
a)    international carriage by air performed and operated directly by the Philippines for non-commercial purposes in respect of its functions and duties as a sovereign State; and
b)    the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by the Philippines, the whole capacity of which has been reserved by or on behalf of such authorities."

(28)    By a Note dated 25 April 2016 (received by ICAO on 7 June 2016) from the Ministry of Foreign Affairs, Guatemala transmitted to ICAO the following declaration:   "The Republic of Guatemala states that the *Convention for the Unification of Certain Rules for International Carriage by Air*, done in Montreal on 28 May 1999, shall not apply to international air transport operations conducted directly by the State of Guatemala for non-commercial purposes relating to its functions and obligations as a sovereign State, nor to the carriage of persons, cargo or equipment for its military command on aircraft registered in or leased by the State of Guatemala, the full capacity of which has been reserved by or on behalf of said military command."

By a Note dated 25 April 2016 (received by ICAO on 7 June 2016) from the Ministry of Foreign Affairs, Guatemala notified ICAO that "to calculate the value of its national currency in Special Drawing Rights, the Republic of Guatemala, as a member of the International Monetary Fund, shall adhere to the provisions set forth in the third sentence of Article 23(1) of the Convention."

(29)    The instrument of ratification by the Togolese Republic contains the following declaration in accordance with Article 57:
"the Convention shall not apply to:
a)    international carriage by air performed and operated directly by Togo for non-commercial purposes in respect to its functions and duties as a sovereign State; and
b)    the carriage of persons, cargo and baggage for the Togolese military authorities on aircraft registered in Togo or leased by Togo, the whole capacity of which has been reserved by or on behalf of such authorities."

(30)    The instrument of accession by the Russian Federation contains the following declaration in accordance with Article 57: "The Russian Federation declares, pursuant to Article 57 of the Convention, that it retains the right not to apply the provisions of the Convention with respect to:
a)    international carriage by air performed and operated directly by the Russian Federation for non-commercial purposes in respect to its functions and duties as a sovereign State;
b)    the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or  leased by the Russian Federation, the whole capacity of which has been reserved by or on behalf of such authorities."

(31)    The instrument of accession by Thailand contains the following declaration in accordance with Article 57:
"the Convention shall not apply to:
a)    international carriage by air performed and operated directly by the Kingdom of Thailand for    non-commercial purposes in respect to its functions and duties as a sovereign State; and
b)    the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by the Kingdom of Thailand, the whole capacity of which has been reserved by or on behalf of such authorities."

(32)    The instrument of accession by Viet Nam contains the following declaration in accordance with Article 57:
"the Convention shall not apply to:
a.    international carriage by air performed and operated directly by the Socialist Republic of Viet Nam for non-commercial purposes in respect to its functions and duties as a sovereign State; and/or

- 9 -

Convention for the Unification
of Certain Rules for International Carriage by Air
Montreal, 28 May 1999

b.  the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by the Socialist Republic of Viet Nam, the whole capacity of which has been reserved by or on behalf of such authorities."

(33)  The instrument of accession by Nepal contains the following declaration in accordance with Article 57:
"the Convention shall not apply to:
a)  International carriage by air performed and operated directly by the Government of Nepal for non-commercial purposes in respect to its functions and duties as a sovereign State; and/or
b)  The carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by the Government of Nepal, the whole capacity of which has been reserved by or on behalf of such authorities."

(34)  At the time of accession, Sri Lanka declared that the terms of the *Convention for the Unification of Certain Rules for International Carriage by Air*, done at Montreal on 28 May 1999 "have been examined and found to be acceptable to the Government of the Democratic Socialist Republic of Sri Lanka subject to reservations declared as per Article 57 of the Convention:
(a)  international carriage by air performed and operated directly by that State Party for non–commercial purposes in respect to its functions and duties as a sovereign State; and/or
(b)  the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by that State Party, the whole capacity of which has been reserved by or on behalf of such authorities."

(35)  On 31 January 2020, the Delegation of the European Union to Canada forwarded a Note Verbale to the Organization concerning the Agreement on the withdrawal of the United Kingdom from the European Union and the European Atomic Energy Community. In the said Note, it requested the Organization to bring the Annex attached thereto "to the attention of the other parties or participants" to "all conventions/agreements/arrangements to which the European Union or the European Atomic Energy Community is a signatory, party or participant, and for which [the] Organization is the depositary or Secretariat". The text of the Annex to the said Note Verbale is reproduced below:

"Annex to the Note Verbale on the Agreement on the withdrawal of the United Kingdom of Great Britain and Northern Ireland from the European Union and the European Atomic Energy Community

1. On 29 March 2017, the Government of the United Kingdom of Great Britain and Northern Ireland (the "United Kingdom") notified the European Council of the United Kingdom's intention to withdraw from the European Union ("Union") and the European Atomic Energy Community ("Euratom") in accordance with Article 50 of the Treaty on European Union. On 22 March 2019, the European Council decided in agreement with the United Kingdom to extend the period provided for in Article 50(3) of the Treaty on European Union until 12 April 2019. On 10 April 2019, the European Council decided in agreement with the United Kingdom to extend the period provided for in Article 50(3) of the Treaty on European Unon until 31 October 2019. On 29 October 2019, the European Council decided in agreement with the United Kingdom to extend the period provided for in Article 50(3) of the Treaty on European Union until 31 January 2020. The United Kingdom will therefore cease to be a Member State of the European Union and of Euratom on 1 February 2020.

2. On 24 January 2020, the Union and Euratom, and the United Kingdom, in accordance with Article 50, paragraph 2, of the Treaty on European Union, signed an Agreement setting out the arrangements for the withdrawal of the United Kingdom from the Union and Euratom ("Withdrawal Agreement")[3]. The Withdrawal Agreement will enter into force on 1 February 2020, subject to its prior ratification by the United Kingdom and conclusion by the Union and Euratom.

[3 The text of the Withdrawal Agreement can be consulted in the Official Journal of the European Union of 12 November 2019, C 384 I, p. 1.]

3. In order to address the specific situation of the withdrawal of the United Kingdom from the Union and Euratom, the Withdrawal Agreement provides for a time-limited transition period during which, save certain very limited exceptions, Union law shall be applicable to and in the United Kingdom and that any reference to Member States in Union law, including as implemented and applied by Member States, shall be understood as including the United Kingdom.

Convention for the Unification of                - 10 -
Certain Rules for International Carriage by Air
Montreal, 28 May 1999

4. The Union and Euratom, and the United Kingdom have agreed that Union law within the meaning of the Withdrawal Agreement encompasses international agreements concluded by the Union (or Euratom), or by Member States acting on behalf of the Union (or Euratom), or by the Union (or Euratom) and its Member States jointly.

5. Subject to timely ratification and conclusion of the Withdrawal Agreement, the Union and Euratom notify parties to the international agreements referred to in point 4 above that, during the transition period, the United Kingdom is treated as a Member State of the Union and of Euratom for the purposes of these international agreements.

6. It is understood that the principles set out in this Annex also extend to international instruments and arrangements without legally binding force entered into by the Union or Euratom and to international agreements referred to in point 4 above which are provisionally applied.

7. The provisions relating to the transition period are laid down in Part Four (Articles 126 to 132) of the Withdrawal Agreement, to be read in conjunction with the other relevant provisions of the Withdrawal Agreement, in particular its Part One.

8. The transition period starts on 1 February 2020 and ends on 31 December 2020, but the Withdrawal Agreement foresees the possibility of adopting a single decision extending the transition period for up to 24 months. In the event of an extension, the Union and Euratom will communicate this by a further Note Verbale.

9. At the end of the transition period, the United Kingdom will no longer be covered by the international agreements referred to in points 4 and 6 above. This is without prejudice to the status of the United Kingdom in relation to multilateral agreements to which it is a party in its own right."

(36)     The instrument of accession by Brunei Darussalam contains the following declaration:
"In accordance with Article 57, the Convention shall not apply to:
a)    international carriage by air performed and operated directly by the Government of Brunei Darussalam for non-commercial purposes in respect to its functions and duties as a sovereign State; and
b)    the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by the Government of Brunei Darussalam, the whole capacity of which has been reserved by or on behalf of such authorities."

(37)     Date of entry into force corrected on 19 July 2023, from 25 to 24 August 2013.